Daniel, J.
The contract between Thomas Chinn of the one part, and Hugh Chinn of the other, of the 27th day of November 1800, is one novel in its character, and in the task of construing it little or no aid is derived from a resort to precedents. The difficulties which embarrass the mind in adjudicating the questions as to the intent and object of the parties to the instrument, arise from the relation which they bear to each other — -that of father and son. The question, whether the deed ought to operate as a sale or an advancement, and if the latter, to what extent, would not perhaps admit of much doubt, if the deed was to be considered by itself. It is a conveyance from the father to the son of a tract of land in fee simple, with general warranty ; and the consideration expressed is an annual rent of 2200 pounds of tobacco and casks, during the life of the father. If the tobacco was a fair and foil rent for the land, and nothing more, as I think is fairly to be deduced from the evidence, and as is admitted by the counsel for the appellees, it would, it seems to me, be proper to construe the deed, standing alone, as importing a lease to the son for the life of the father for an equivalent, and a gift or advancement of the remainder in fee. Annexed to the deed, however, is a covenant on the part of the son. by which he undertakes to “pay to *358 Thomas Chinn sen’r (the father) the sum of five hundied pounds for the said conveyance, provided he should ever find himself reduced to the necessity of demanding it; in which case the rent reserved in the deed is to cease> and the demand of the principal herein promised to be a clearance from said rent.”
The covenant further provides, “ that the sum of eighty pounds paid by Hugh (the son) for a lease in part of this land, is to be deducted in case the five hundred pounds is demanded.”
The counsel for the appellees admits “ that the undertaking to pay £ 500 for the -said conveyance by this deed, should the father be reduced to the necessity of demanding it, if taken by itself, would convey the idea that the £ 500 was to be the purchase money of the land in fee.” But he proceeds to argue, that w'hen all the parts of the covenant and deed are taken together, the covenant ought properly to be taken as securing to the father the right and privilege, should his necessities require it, of selling out the rent charge to Hugh, at the liquidated and agreed sum of £ 500. The objections which the counsel supposes might be raised to this construction, to wit, that the value of the rent charge is rated too high, and that it would be unreasonable to assign a fixed value to a subject constantly diminishing in value, are to my mind of great force, and not satisfactorily met by the answer which he gives to them. That answer is that the contract is so written; that the father, because he was father and donor, dictated the terms of the contract; and that the reservation of a right to demand £ 500 was probably regarded by Hugh as a mere pledge exacted by the father for the good behaviour of the son.
The counsel proceeds to argue further, “ that if the £ 500 had been regarded by the parties as the consideration for the fee, the covenant would have proceeded to say, ‘ in which case the said Hugh, on paying the *359 five hundred pounds, is thenceforth and from the time of such payment to hold the land in fee to him and his heirs,’ or something to that effect.” It seems to me a fair replication to the latter branch of this answer, to say, that the “ holding the land in fee” was in no wise dependent on the payment of the £ 500. The deed is an absolute conveyance of the fee, and contains no defeasance to take effect on the demand by the father of the £ 500, and the failure of the son to pay it. The question is not, whether Hugh has entitled himself to the fee in the land, but whether he holds it as a donee of the father, or as having paid or contracted to pay for it a just equivalent. It may be true that the father dictated the terms of the contract: and it is not improbable that in giving shape to it he sought to retain to himself a certain degree of influence and control over the conduct of his son. I cannot see however how this affects the question before us, to wit, whether the £ 500 was the value, and was contemplated by father and son as the value of the rent charge, or was treated by them as the value of the fee. The father parts with the absolute fee, reserving to himself a stipulated rent, and also requires at the hands of the son a covenant to pay him, in a certain event, £ 500, in which event the rent is to cease. If we could for a moment believe that it would have been a benefit to the son to exchange the £ 500 for the rent charge, then there would be some force in the argument, (derivable from the power vested in the father alone, to bring about such exchange, by making the demand for the ¿Í500, and the consequent influence such power would probably exert over the conduct of the son,) that the parties regarded the £ 500 when demanded, as the equivalent or consideration for tho rent charge alone. There is not, however, the slightest pretext for the supposition that the mere ex-tinguishment of the rent charge by the payment of the £ 500 could be advantageous to the son. Such being *360 the ease, and the son having an absolute estate in the land, which was not to be enlarged by the payment of the £ 500, nor defeated by a failure of payment, it is manifest that the degree of control which the father retained to himself, by the covenant, over his son, could ' J * ? in no wise be varied by regarding the £ 500 as the consideration of the fee, or as the consideration of the rent charge; and, consequently, the motives of the father in reserving the right to demand the £ 500, supposing them to be as represented by the counsel for the appellees, do not aid at all in solving the question, whether the son ought, upon the supposition he had paid the £ 500, on the demand of the father, to be treated as holding the fee upon the death of the latter, intestate, as an advancement oras a sale. Nor do I think that the contract is so written as to import, when its language is fairly interpreted, that the £ 500 was to be the price of the rent charge. It is true that on the demand of the £ 500, the rent reserved in the deed was to cease. Still the terms of this provision of the covenant, are, it seems to me, just as consonant with the idea that the £ 500 was regarded by the parties as the price of the fee, as they are, with the idea that it was a sum stipulated for as the equivalent of the rent. If it was the understanding of the parties that the demand of the £500 was to place father and son in the relation towards each other of vendor and purchaser of the fee, it could not be otherwise than proper that the demand should be followed by a cessation of the rent. And on the other hand, if the father intended the remainder in fee as a gratuitous benefit or advancement, and looked to the £500 as the price only of the rent charge, it would be equally proper that such price being demanded and paid, there should be no longer a continuance of the burden which it was intended to discharge. In this state of doubt as to the true meaning of the parties, arising from the ambiguous phraseology of the covenant, it becomes *361 proper and necessary to look to the subject matter about which the parties were treating, and to enquire as to its probable value at the date of the contract. Some four or five witnesses have been examined as to the value of the land in the year 1800. One of them places it as high as forty shillings, another as low as twenty shillings per acre; the others value it at from twenty-five to thirty shillings. The mean estimate of the witnesses would shew that £ 500 was about a fair price for the land; and we have also the evidence of the individual who wrote and attested the deed, that the father regarded £ 500 as the value of the fee. With this testimony before us, it seems to me clear, beyond any just ground for doubt, that the £ 500, if contemplated by the contracting parties as the consideration for either subject, the rent charge or the fee, has reference to the latter, and not the former. If any doubt however still remained, a reference to the original bill of the appellees would at once dispel it. They there allege, that “ the lease was given to Hugh for his advancement in life, at a rent far short of its value; and that there was a provision annexed to said lease, that said Hugh might acquire the fee simple in said land, by paying the said Thomas during his lifetime the sum of five hundred pounds, on the demand of said Thomas.’1'1
If then the execution of the deed had been immediately followed by a demand and payment of the £ 500 before there had been any increase in the value of the land, it seems to me that such a transaction, taken in connexion with the proof that £ 500 was a full equivalent for the land, would place the father and son in the relation of vendor and vendee, just as fully as if the contract had been between strangers. And I cannot perceive how the fact, that the demand was delayed till after the lapse of many years, and after a considerable appreciation in the value of the land, can in any manner affect the result. The always present and continuing *362 liability of Hugh, under his covenant, to pay to his father, whenever he might demand it, the fixed sum of £ 500, whether the land should rise or fall in value, places him, when the demand is made, in the same relation to the question whether he is to be treated as a x vendee or donee of the land, that he would have occupied had such demand been made at the date of the execution of the contract, or at any intermediate point of time between that and the period when the demand was made.
Looking to the character of the contract, to the fact that the twenty-two hundred pounds of tobacco was a full rent, and £ 500 the fair price for the land, and that the father himself so regarded it, I have come to the conclusion, that it was the intention of the parties that Hugh, in the event of a demand by the father, and a payment by the son of the £ 500, should be regarded as a purchaser of the land. That the £ 500 covenanted to be paid,, was not a mere arbitrary sum dictated by the father without reference to the value of the subject granted, but that both parties contemplated the value of the land, regarded the £ 500 as its equivalent, and fixed upon that sum as the price at which it might be in,the power of the father, consulting his own comfort and convenience, to convert into a sale, that which, without a demand on his part for the £ 500, would be an advancement to the son.
In 1802 Thomas Chinn sen’r conveyed to his son Robert, 200 acres of land by a deed, very similar to the one previously made to Hugh. The main features in which this contract between the father and son departs from the one between Hugh and his father are, that in the case of Robert the rent reserved is a money rent of £ 20, and is to continue during the lives both of the father and his wife; that the covenant to pay the £ 500, if called for by the father in his lifetime, forms a part of the deed itself j and that the latter contains a clause re *363 serving to the father the right, should the £ 500 remain in arrear for the space of twelve months after demand made for its payment, to re-enter and hold the land as if the conveyance had never been executed.
As to what was the exact value of Robert's tract of land at the date of the contract between him and his father, the testimony is not so full as that in relation to the tract conveyed to Hugh. The witness, Burr Powell, who wrote the deed from Thomas Chinn sen'r to Hugh, and who seems to have had frequent conversations with the former on the subject of his contracts with his two sons, states, that the former regarded the £ 500 as about the fair value of each tract at the dates of the respective conveyances; and as there is nothing in the record to shew that Robert's tract was worth more than that sum, I take it that £ 500 was regarded by the parties as in the case of Hugh, as a fair equivalent for the fee.
Some time after the execution of the deed to Robert, his father made a demand for the £ 500, the payment of which Robert effected by a sale of the land conveyed to him by his father. The land sold at the price of £ 900, and the purchaser by the direction of Robert paid to his father the sum of £ 500; and the balance £ 400 was paid to Robert. For the reasons stated above in relation to the contract between Thomas Chinn sen'r and Hugh Chinn, I regard Robert as a purchaser of his tract of land at the agreed price of £ 500; and, therefore, think that the Court erred in charging him with the £ 400 as an advancement, in the division of the real estate of his father.
A like demand was made by Upp as the agent of Thomas Chinn sen'r on Hugh for the £ 500, covenanted to be paid by him, subject however to a credit for the £ 80, which the covenant recites to have been paid by Hugh for a lease in part of the land; and which it provides should be deducted in case of a demand for *364 the £ 500. Hugh did not pay the balance £ 420, but proposed to offset the demand by an account which he presented against his father. The justice of this account was to some extent admitted by the latter, who, on various occasions, expressed his willingness to go into a settlement; and several efforts were made by the parties to settle, but without success. It seems to me that this demand, followed by the expression of a willingness on the part of both parties to account with each other, gave to the transaction the same character, and placed Hugh on the same footing, with respect to the question of advancement or sale, as if he had paid the money on the demand.
It made absolute the covenant which was before conditional. If the father had died without making the demand, Hugh might have held the land without being compelled to pay the £ 500. But the father, to whom the right of demanding it appertained only during his life, chose to exercise his privilege; and died leaving the demand unrevoked, and an item in an unadjusted account between him and his son. Had the father died leaving no estate to divide, I do not see how Hugh could under the circumstances have protected himself against a recovery on the covenant, in a suit by the personal representative of Thomas Chinn sen’r. If the covenant had any force at all after the death of the father, it was absolute against Hugh for whatever balance was due upon it; and the representative had no election in the matter. That such was the legal effect of the covenant, and the transactions of the parties in relation to it, the administrator of Thomas Chinn sen’r, who was also one of those entitled to a division of his real estate, has himself recognized and insisted upon; and has in fact taken a decree for the £ 420. I think, therefore, that Hugh ought to have been permitted to hold his tract of land as a purchase, and not as an advancement; and that he ought to be compelled to pay whatever balance may be due on the covenant.
*365 It is argued that these transactions between the father and his two sons can neither of them be properly treated as a sale, because of a want of mutuality between the contracting parties : that the right of treating the £ 500 as an absolute debt rested entirely with the father, and, J therefore, that the covenants on the part of the sons to pay the £ 500, if demanded, ought to be treated as nothing more than a reservation of a right on the part of the father to recall to a certain extent, the advancements made them by the deeds. The fair answer to this seems to me to be, that if the covenants were intended merely to give to the father, in substance, the right to recall a part, or even the whole of an equivalent for the advancements, there would have been a provision that the sons (inasmuch as they were paying annually a full rent) should be compelled, on the demand made, to pay each only so much of the £ 500 as might not exceed the then value of their respective tracts. Otherwise the sons might, in the event of a depreciation of the land, and a demand by the father, have been subjected to an actual loss. As by their covenants they did incur these hazards of purchasers, why, in the division of the estate, shall they not be permitted to enjoy the benefits of purchasers, resulting from a rise in the value of the land ? The hardships to the other children of the intestate, which arise from treating Hugh and Robert as purchasers, are about the same that would have arisen, had the father made, at the respective dates of the conditional bargains with his sons, absolute sales of his land to persons alien to him in blood. Had he sold the land to strangers, he would have obtained, in all probability, for each tract the sum of £ 500, and no more; as that sum is shewn to be their full value. Under the contracts with his two sons he has obtained from each a like sum, or its equivalent, and also a rent, nearly equal to, and standing in the place of, interest, annually, from the date of the contracts up to the date of the demands. The injury to *366 the appellees, therefore, has not resulted from any intentional and peculiar benefits conferred by the father on his two sons, to the prejudice of the other children, but from his having parted in his lifetime, for what he supPose(^ a ^a‘r Piace; with property which thereafter greatly appreciated in value.
It is said that the law of hotchpot repeals all gifts, all advancements made by the intestate to those who seek to share in the division and distribution of his estate. This is true: but it does not follow that all bargains between a father and any of his children, which have resulted to the advantage of the latter, are to be surrendered up to be cancelled as the condition of their being allowed to come into the partition of the estate left by the former. If, at the division of a father’s estate, on looking back to a contract between him and his son, purporting on its face to be a sale, we should find that the former had parted with his property at a price grossly inadequate, and yet that the transaction was free from any fraud or imposition, the fair inference would be, that, notwithstanding the form of the contract, the parties did not really mean to treat with each other as vendor and purchaser; but that the father intended the benefit of such contract, or the excess in value of the subject parted with, over that of the price received in exchange, as an advancement to the son. If, on the other hand, we should regard the bargain as one, which, though eventuating in benefit to the son, or even decidedly favourable to him at the date of the contract, was still such as might have resulted from a fair and equal treaty between strangers, I know of no law which would justify us in depriving the son of the benefits of his contract.
With these views of the rights of the appellants, it becomes necessary for me to consider whether by their laches or otherwise, they have deprived themselves of the privilege of insisting upon them in this Court. It is contended that they have'; that there has been a vir *367 tual abandonment by the appellants of their objections to the interlocutory decree of the 27th of November 1819 ; and that it would be establishing a most dangerous precedent, to permit them now to agitate questions so long settled. That both causes were very much neglected by the parties on both sides, is readily conceded; but that the failure of the appellants to have a hearing of their exceptions to the report of the commissioners appointed to divide the lands, at an early day, proceeded from any abandonment of those exceptions, is not, in my opinion, so plain as to justify us in shutting the door to all enquiry upon the subject. It is true that a loose practice prevails in friendly suits brought for the partition of the estates of decedents; and it cannot be denied that in some instances injustice might be done, if after the lapse of many years, since the entry of an interlocutory order for a division of the estate, and a division made in pursuance thereof, the parties should be permitted to treat the proceedings as still susceptible of revision and alteration. And I readily concur that the Courts should be slow in receiving applications to rehear and set aside such orders, when it is apparent that they have not been made final, only because the parties have failed to solicit the further action of the Court. Yet the evil, in such cases, of holding the proceedings, liable to revision on the application of the parties is not, perhaps, so great as may at first appear; for, in most cases of the kind, where it has been the purpose of the parties to abide by the intermediate action, the interlocutory order of the Court, as definitive, and conclusive upon their rights, it would not be difficult, except after a very great lapse of time, to refer to some act or acts of the parties out of Court, or to prove some contract or admission, affording unequivocal evidence of such purpose. With every disposition to sustain as politic and wise the rules adopted by Courts of Equity to incite the diligence and discourage the laches of those who may seek their *368 aid, I cannot perceive that there has been any such plain infraction of these rules in the cases before us, as would justify us in inflicting upon the appellants as a penalty therefor, the loss of any important rights which they may have possessed at the commencement of these suits.
And, in the first place, it is worthy of‘remark, that the suits were not what are usually termed mere friendly suits, in which the parties were asking the Court to sanction and assure to the respective parties, by its mere formal action, certain rights about which there was no dispute. On the contrary, the bills and the answers disclose the fact that the parties were directly at variance on questions in many respects peculiar and novel in their character, the decision of which was most materially to affect the claims of some of them to share at all in the division of the estate. Much testimony was taken on both sides, bearing on the questions in controversy ; and the Chancellor, when he came to make his interlocutory order for a division of the estate, instead of pronouncing a decree calculated to satisfy Hugh and Robert Chinn, that their pretensions were without foundation, and could receive no countenance in his Court, accompanies the order with a written opinion, in which he expresses his own want of confidence in the correctness of the decision, invites the parties to controvert it by exceptions to the report of the commissioners when it should come in, and promises that the matters of controversy shall be again more maturely considered on such exceptions. The commissioners act and make a report, in which it is shewn that, on the division of the estate, they have in the main carried out the principles of the decree; and at the term next after the return of the report, those representing the interests of Hugh and Robert Chinn, file their exceptions, reasserting essentially the claims presented by them in their answer and cross-bill. At the April term 1827, the death of Robert Chinn is suggested, and at the April term 1828, leave is *369 given the plaintiffs, in the original suit, to amend their bill and revive the suit against his heirs; and a guardian ad litem appointed to defend the infant heirs. And at the same term, on the motion of the same parties as defendants in the cross suit, a rule is granted against the heirs of Robert Chinn and the other plaintiffs in said cross suit, to revive their suit at or before the next term. These are the only steps, of which the record furnishes any evidence, taken by the parties, in the interval between the filing of the exceptions at the September term 1820, and the decree of 1836. Prom the fact that other changes in the state of the parties had taken place between 1820 and 1828, (as appears from the bill for a rehearing and the answers thereto,) which it was equally as necessary to notice as the death of Robert Chinn, in order to carry on the suits, it is not improbable that the steps above mentioned were taken by the counsel without any conference with their clients; as, otherwise, these other changes would most probably have been noticed, and the steps thereby rendered necessary taken, if the parties were looking to any further important action of the Court. And it cannot be denied, that this state of the record furnishes strong ground for the inference, that the parties on both sides were disposed, from some cause inconsistent with the idea of a continued controversy, to leave matters to rest as they were. It is difficult, however, to conceive that if the parties all acquiesced in the decree of 1819, and the division under it, there could not have been furnished some evidence of the fact, other than that to be derived from their mere failure to move in the cause. The action of the Court, too, in 1836, contradicts the idea of any such acquiescence, of any waiver, by the appellants, of their exceptions to the commissioners’ report. The Court proceeds to notice, consider and decide upon the exceptions exactly as it would have done had they been but recently filed. There is nothing in the decree of the Judge *370 from which to draw the conclusion that he regarded the controversy as abandoned. Had he so regarded the matter, it is but fair to presume that the decree would furnish some indication of such opinion. By giving the appellees a decree for the £ 500 less the £ 80, the Court decided that a most important demand of the appellees had not been settled by the decree of 1819. What evidence or reason was there for supposing that the appellants had abandoned their exceptions, their claims in the controversy, which would not equally shew that the appellees had abandoned their claim for the £ 500.
Again, if we look to the conduct of the appellees themselves, it is utterly at war with the idea that they regarded the decree of 1819 and the action under it, as disposing definitively of all important matters of controversy between the parties. If, as soon as the decree of 1836 was rendered, they had come forward and renounced the benefit of that portion of it decreeing the payment of the 1399 dollars by the heirs of Hugh Chinn, and had stated that it had been rendered by a mistake on the part of the Court or their counsel; that all parties had regarded the decree of 1819 and the division under it, as settling all matters in dispute, and had from that time, either by an express agreement or tacit understanding, acquiesced in it; in such case it might not, perhaps, have been improper to conclude, that such indeed was the fact, and that the decree of 1836 was the mere mistake of the Court, who had taken up the case and pronounced the decree as a matter of course. Such, however, has not been the conduct of the appellees. It appears that their counsel, at least, were present at the rendition of the decree of 1836, and must be regarded as assenting to and approving it. And in their answers to the bill and petition for a rehearing, the appellees, instead of admitting the manifest error in the decree by which Hugh Chinn’s heirs, though denied all participation in the division of the es *371 tate, are decreed to pay the 1399 dollars, avor that such decree is consistent with the demands made in their bill; and insist that the decree of 1836 is, in all respects, right and ought not to be reheard. The appellees do not even hint, in their answers to the bill for a rehearing, that there had been any agreement on the part of the appellants to abide by the decree of 1819. There is no allegation that, lulled into security by the conduct of the appellants, they have failed to take any steps or to procure any testimony necessary to the security of their rights which might otherwise have been taken or procured. The statements in relation to this matter, in the answer of Murray and wife, (which with slight exceptions are identically the same with the statements in the answers of the other appellees,) are, that the principles of the decree of 1819 were fully discussed before the decree was rendered; that the parties took and held the portions, respectively assigned to them, as then-own ; that the exceptions have been virtually abandoned long ago, for the exceptors have never brought them before the Court, and the other parties have treated the land as their own, and have in several instances transferred, conveyed and incumbered their portions, with the knowledge of the exceptors; that the exceptions are in fact mere objections to the decree of the Court and must be laid out of view. And they proceed to say, that the question before the Court is, whether, after such lapse of time and after various other interests are involved, a petition for a rehearing ought to be entertained. At what time the conveyances above spoken of were made, the answers do not say; nor do the appellees even suggest that such changes in the property took place in consequence of anything said or done by the appellants calculated to induce the belief that they did not mean at any time to disturb the division. As to the allegations that these changes were made with the knowledge of the appellants, there is not offered the *372 slightest proof. To what, then, do these answers in fact amount ? It seems to me to nothing more than an argument that the mere lapse of time and certain changes made by the appellees in the property assigned to them, are of themselves sufficient to debar the appellants of a right to enquire into the propriety of the decree of 1819.
In order to reconcile the conduct of the appellees in taking and insisting on the decree for the 1399 dollars^ with their answers to the bill for a rehearing, it is necessary for us to suppose that the heirs of Hugh Chinn were quietly acquiescing in a division which excluded them from all participation in the estate ; and were yet content to stand exposed to any recovery the appellees might still obtain against them on account of the covenant to pay the 500. In other words, the appellees do in effect contend, that the case was still open in 1836, so far as all claims asserted by themselves were concerned, but closed as to all the demands asserted by the heirs of Hugh and Robert Chinn: that lapse of time could not and ought not in any wise to affect their claim to the 1399 dollars, but that the appellants, who stood in the same predicament with themselves as to laches, ought to be treated as having waived all benefit of their exceptions.
In England there is no statutory limitation either to a bill of review or a petition for rehearing of a decree which has not been enrolled; and the Courts have adopted the period of twenty years, in both cases,. as that beyond which they will not disturb such decree. Daniel in the 3d volume of his Chancery Practice, p. 1620, says: That “by an old order of the Court it is directed that when any parties shall be dissatisfied with the judgment of the Court given upon the hearing of any cause, they do, if so advised, petition for a rehearing within a fortnight after the decree pronounced. This order has not however been followed in practice, and a *373 rehearing has been granted at the distance of two years, on the application of a defendant, of a decree nisi made absolute against him according to the regular practice of the Court. The Court has also reheard a cause at the distance of eighteen years from the time the decree conplained of was pronounced, and has refused to discharge an order for a rehearing though at the distance of twenty-four years.” He proceeds to state that twenty years from the time of pronouncing a decree, is allowed, both in the case of a bill of review and a petition for rehearing : that a rehearing may be obtained after the decree has been carried into execution. And he cites instances of a rehearing had, although it was objected that the plaintiff by carrying the decree into execution had precluded himself from disputing the propriety of it. Daniel’s Ch. Prac. p. 1620. Even, therefore, if Hugh and Robert Chinn had acted under the decree, the authority shews that such action would not necessarily deprive them of a rehearing. But they have in fact done nothing under it which they might not properly do ; whether they intended to seek a rehearing or not. They were not called upon to surrender any portion of the lands which they respectively held, and there was no aspect of the case in which they could properly be decreed to surrender up any. It is true that Robert received in the division and allotment a small portion in addition to what he already held ; but this he must have done in any event. There was no controversy as to his right to hold what he already held, or what he obtained in the division. The only question as to him was whether he was not still entitled to receive more. No argument therefore favourable to the idea of an acquiescence in the decree of 1819 by the appellants, can be derived from the fact stated in their petition for a rehearing, that they had proceeded to dispose of their portions as their own. It seems to me not at all improbable that the appellants failed to move in the cause only because *374 of a belief that they had done every thing which it was necessary for them to do in order to obtain a hearing. They had gone on promptly to take all the testimony which they had to furnish; and at the suggestion of the Court itself, they had proceeded to file exceptions to the report of the commissioners, made in conformity with its decree. The exceptions were in fact objections to the decree ; and the filing of them was under the circumstances equivalent to the presentation of a petition for a rehearing, filed at the instance of the Court.
The appeal brings up the propriety of all the decrees made in the cause. That portion of the decree of 1836 which directed the payment of the 1399 dollars by the heirs of Hugh Chinn, was corrected by the Judge below in his decree of 1840, and has been adverted to in connexion with the conduct of the appellees in respect to it, for the purpose of shewing that they themselves in 1836 regarded an important question in the controversy as still open. To decide that the appellants shall under all the circumstances of the case be denied the right of a hearing on’ the merits, on the grounds of laches and acquiescence set up by the appellees, would, it seems to me, to be establishing a precedent which might make a very ready disposition of many important controversies now sleeping in the several Chancery Courts of the State; but the good effect it might have in inciting the diligence of suitors would, I should apprehend, be far more than counterbalanced by the loss of valuable and important rights, which would in many instances follow, as the consequence of its application.
There is in our State no limitation by statute to a petition for a rehearing, and instead of there being any argument against a rehearing in this case, deducible from the fact that there is a statutory limitation to bills of review, the argument seems to me to be the other way. The fair inference to be drawn from the absence of any enactments on the subject is, that our legislature did not *375 deem it wise to restrain the discretion of the Courts in the matter, but on the contrary, considered that the ends of justice would be best promoted, by leaving the Courts free in all the cases before them not finally adjudged, to revise and correct any errors apparent on the face of the proceedings prejudicial to the rights of the contending parties.
I am of the opinion that there is no error in the proceedings and decrees of the Court below so far as respects the tract of land alleged to have been conveyed to Robert by his father a short time before the death of the latter, and the interest in the house and lot in Middleburg, for which Thomas Chinn sen'r executed a deed of release to his son-in-law John Upp, on the 16th of December 1815.
Baldwin, J. In no point of view, can the conveyance from Thomas Chinn the elder to his son Hugh, and the cotemporaneous agreement between them, be treated as a purchase from the father by the son of the land to which the latter thus acquired title. There was no consideration for the conveyance of the fee, except that of natural love and affection; and the reservation to the grantor, during his life, of an adequate rent, placed the parties, for the time, in the relation of landlord and tenant. The stipulation for the payment of £ 500 by the grantee for the conveyance, if the grantor should ever find himself reduced to the necessity of demanding it, did not constitute the son a purchaser, there being no mutuality in regard to that matter ; for it was a mere privilege reserved to the latter to exact it, and the son had no authority to compel its acceptance. And even if the son had tendered, and the father had accepted the money, the only effect of that circumstance would have been to terminate the rent, and anticipate the period for estimating the value of the subject granted. The transaction would still have been, as it was at first, an ad *376 vancement from the father to the son; and the enquiry would still remain as to the value of the advancement, to be determined by the value of the subject at the time when the son came to its effectual enjoyment, with a reduction of the sum actually paid by him. If the land were worth no more at the time of such payment, then the advancement would in effect be extinguished; and if worth more, then it would be reduced pro tanto.
That such would have been the result is evident, both from the terms of the agreement, and the essential nature of such a transaction between father and son. The only effect of the exaction and payment of the 500 was to be, as provided in the memorandum on the deed, that the grantee should be exonerated from the payment of the rent; and there is nothing to indicate that thenceforth the subject was to be uninfluenced by the relation betwixt the parties of father and son; and indeed it is difficult to conceive that such a contract would ever have been made between strangers in blood. The intent of the father, who of course prescribed the whole arrangement, seems to have been, to give to the son a home which ,,he might manage and improve according to his discretion; with a reservation to himself, in the form of rent, of a stipulated annual sum applicable to his current wants, and moreover the power, should he choose to exercise it, notwithstanding the absolute conveyance, of substantially recalling or diminishing the advancement, by requiring of his son the payment of money to a given amount. In this there could be no injustice to the son, for he would still stand in regard to expectations from the bounty of his father, and the ultimate division of the estate in the event of the father’s intestacy, upon a footing of equality with the other children.
The case is to be governed, not by the law of contracts, but by the provision in the law of descents in relation to advancements. That provision is founded *377 upon considerations of justice and sound policy, and a fair presumption of what the intestate would substandaily have done, if he had perfected a distribution of his property amongst his children in his lifetime, or had carried it out by last will and testament. It in no wise J interferes with a man’s dominion over his property, so as to prevent him from giving it to whom he pleases in his lifetime, or leaving it to whom he pleases at his death. It has no application to a case of partial intestacy, because the reasonable supposition is, when the decedent has made a will, that he has thereby corrected inequalities so far as he desired to do so. But the law of descents having adopted the rule of equality, the provision in regard to advancements was necessary to preserve and accomplish that equality; for the equality contemplated was not merely a division into equal parts of what should remain of the intestate’s estate at the time of his death, but an equal participation substantially, so far as practicable, of what had been, as well as what might have been the subject of his bounty, amongst those nearest to him in blood, so as to correct inequalities as far as the decedent himself had the power to correct them. He could not have recalled what he had given in his lifetime; but he might have corrected inequalities, in the whole or in part, by the disposal by will of his remaining property; and having failed to do so from accident or neglect, the law undertakes to do it for him; and does it by requiring those advanced in his lifetime to come into hotchpot with the rest, if they seek any thing more than they have already got.
Treating the conveyance from the father to the son as an advancement, (and ic could be nothing else, inasmuch as it was not a sale,) the question then arises as to the period of time in reference to which the value of the subject is to be estimated. Is it the date of the conveyance, or that of the grantor’s death, when by the termination of the rent the grantee came to the enjoyment *378 of the profits as owner of the property ? It could not be any intermediate period, for the gross sum stipulated has never in fact been paid, and could not have been paid by the son, whether in cash or set-offs, without the concurrence of the father, who was in no wise bound to receive it in any form or shape; but had a right to hold on to the rent during his life. And though the grantee would have been obliged to comply with a demand for the gross sum, if persisted in, yet the grantor was at liberty to waive it at any time before actual payment. In no aspect, could the son rightfully refuse, as he did, to make payment in money, and set up an unliquidated and disputed account by way of offset; for the respective claims were wholly different in their nature, that of the father to recall or reduce a voluntary advancement, and that of the son to recover what he demanded for services rendered.
Advancement imports a substantial benefit in money or property, conferred by a parent upon his child, without an equivalent from the latter, by an act of the former in his lifetime, other than the making of a last will and testament. Where the gift, grant or conveyance confers a title to the thing, or to the use of it, and the effectual possession, so as to bestow the immediate enjoyment, or opportunity of enjoyment, it is a present advancement. But where, from the want of a present title or effectual possession, the enjoyment and opportunity of enjoyment are postponed until a subsequent event or period, there the gift, grant or conveyance operates as a future advancement. In the former case the value of the subject is to be estimated as at the date of the gift; in the latter when it substantially takes effect.
This distinction is founded in the nature of the transaction and the spirit of the law, and looks to considerations of justice, convenience and policy. If a father gives to his son a tract of land, or a slave, or a sum of money, or other property, for the purpose of being *379 thenceforth held and enjoyed as his own, this confers upon him an immediate benefit, and tends not only to promote his present comfort, but to enable him to im1 i ■ ■ 11 * . n . ... prove his circumstances and advance his fortune in life. He becomes at once complete master of the subject, with all its advantages, and may retain it with a view to its profits and increment, or dispose of it without the necessity of sacrifice, to obtain other benefits in a different form. It has therefore been wisely held that, in such cases, the value of the advancement is to be estimated as at the date of the gift; without accountability of the donee for future rents, profits, interest, increase, enhancement or gain; and, on the other hand, without resort to the intestate’s estate for any depreciation, diminution or loss, whether occasioned by mismanagement, misfortune or accident. Beckwith v. Butler, &c., 1 Wash. 224; Hudson, &c. v. Hudson’s ex’or, 3 Rand. 117; Knight v. Yarbrough, 4 Rand. 566; Oyster, &c. v. Oyster, &c., 1 Serg. & Rawle 422; Osgood v. Breed’s heirs, 17 Mass. R. 356.
But the principle of these decisions is not applicable to future advancements. Take the case most analogous to the present, of a gift by a father to his son of real estate in fee, but to commence in futuro, say at the death of the grantor, or with a reservation of a life estate to himself, or with a trust for payment to him of the profits during his life. There the gift may be said to be immediate, but the advancement is future. The donee gains no benefit from the subject in its then condition, nor can he derive any till his father’s death, unless he divest himself of his ultimate ownership by a sale of it for what he can get.
That such a gift is an advancement cannot be doubted ; but it is not because it anticipates the donee’s possession and enjoyment, as in the case of a present advancement ; but because it secures to him, by an act of the donor in his lifetime, a future possession and enjoyment, which *380 cannot be recalled, without an express reservation of the power to do so. It gives him a separate specific part of the intestate’s estate, which cannot be altered or diminished without his consent; but it gives it to him with a view to his ultimate enjoyment of the subject in kind, according to its value when it shall accrue, and not with a view to his present enjoyment of an anticipated equivalent, to be obtained in the market. The law in such a case contemplates equality, as well as in a present advancement, but to be reached in a different way; not by looking to an estimated value at the time of the gift, with the advantage of accruing profits, increment and other benefits, but by looking to the relative value, compared with that of the intestate’s other estate at the time of his death; and by so doing conforming in all probability to the donor’s own purpose in postponing the possession and enjoyment of the subject until his death, so that the respective interests of his children should be then equalized, as far as practicable, according to their value at that period.
The present case is governed by the same reason as the one just supposed. The reservation of the rent to the donor retained to him for his life the substantial profits of the land, throwing out of view the donee’s own care, labour and capital employed during that time; as much so as if the gift had been of the fee after the donor’s death. If this be not a future, instead of a present advancement, then no such distinction, (though well recognized by authority,) can exist, and all donations of a father to a child, whether in presentí or in futuro, vested or contingent, must be regarded as immediate advancements, to be estimated as of the value in the market at the date of the gift.
I might here rest the case upon the distinction between a donation of land from a parent to his child, to take effect in possession and enjoyment immediately, and one by which the effectual possession and enjoy *381 rnent are withheld by the donor for himself, until the time of his death. But the principle of the distinction covers broader ground, is applicable to personal as well as real property, and is open to considerations on the one side and the other, under a variety of circumstances, calculated to test its soundness. The case itself occurs under the law of descents as it stood anterior to the revisal of 1819; which law provided only for bringing advancements of real estate into hotchpot, while the law of distributions before that time embraced only advancements of personal estate. But by the revised acts of 1819, concerning descents and distributions, advancements, whether of realty or personalty, are placed on the same footing in reference to both. That however was the only effect of those statutes, and the principles governing the subject of advancements, whether in relation to real or personal estate, were before, and still continue, the same.
I take the broad and pervading distinction to be, as already stated, between present and future advancements, or in other words, (to avoid sticking in the letter of the term advancement,) between a present and a future provision made by a parent for his child, by an act of the former in his lifetime. A future provision is not a present advancement. If a father gives to a son a tract of land, or a slave, or a horse, or government stocks, or bank shares, or a mercantile partnership interest, to take effect at the donor’s death, or the death of a third person, or at the expiration of months or years, or on the happening of a contingent event, where is the necessity or propriety of bringing the subject into the partition or distribution of the intestate’s estate, according to its estimated or conjectural value at the date of the gift ?
The reasons ruling a present advancement are not applicable to such a provision. The donee can obtain no benefit from the devotion of his skill, labour and enterprise to the subject: he cannot prevent deterioration *382 or losses from the imprudence or negligence of others having the possession or control of it; he has no enjoyment of the profits; and the capital is not one which he can shift into a different form of the like value, better a<^aPt;e^ to his exigencies and pursuits. He may, it is true, sell his postponed interest for a price more or less according to circumstances, it may be for something or a mere song. The immediate benefit to be derived from a sale would in many instances be unimportant, and the prospective advantages of a future complete title and possession would enure to the speculating purchaser, but be lost to the intestate’s aggregate estate, and be borne by the unadvanced children, whose shares would have to contribute to make up the full share of the advanced child, according to the estimated value of his advancement as of the date of the gift.
To treat a future provision as a present advancement would not tend to promote the equality contemplated by the statute, but the reverse. While the donee retaining his interest would get the benefit of any intermediate increment or enhancement of the subject, he would be accountable, in the partition and distribution of the estate, only for the inferior estimated value of his interest as of the date of the gift; and thus might get a double or treble portion of the aggregate estate : on the other hand, if from intermediate losses or depreciation the. subject should fall below the estimated value as of the date of the gift, the donee would be confined to that estimate in the partition and distribution of the estate, however great the increment or enhancement of the other property; and so might get only a half or a third of a portion. Now such inequalities would be avoided, at least to a great extent, by making the donee accountable for the value of the future provision at the time when it becomes effectual; and where that occurs about the time of the partition and distribution of the intestate’s estate, equality is attained as far as practicable.
*383 In simple donations, it is true, the risk of depreciation or destruction of the property must be borne by the donee, whether his interest be immediate or remote : such is the necessary consequence of title merely. But an advancement to a child from his father who dies intestate, is not a simple donation ; it has an important element unknown to other gifts. Though irrevocable by the parent, it is substantially revoked by the law of descents and distributions, as the condition of the child’s participating in the rest of the intestate’s estate. By what has been called a parliamentary will, the law conditionally disposes amongst the intestate’s children of his whole estate, embracing that which he gave to any of them in his lifetime. In doing this, with a view to equality, the law is governed by considerations of justice and policy. In regard to immediate advancements, it makes the donee accountable, for reasons already suggested, for the value at the date of the gift; and consequently he is entitled to the benefit of any increment or appreciation, and must bear any loss from depreciation, deterioration or destruction of the property. But in regard to future advancements, it makes the donee accountable for the value at the time they became effectual, and consequently he gains nothing from intermediate increment or appreciation, and suffers no loss from depreciation, deterioration or destruction.
According to this view of the matter, all advancements, whether present or future, are placed in one respect on the same footing: they are all to be estimated according to the value of the property at the time when they became effectual; which time as to present advancements corresponds with the date of the gift, but as to future advancements, with a period or event subsequent to that date.
The rule thus ascertained for estimating, in the partition and distribution of intestates’ estates, the value of advancements, is not only the most equal and just, but *384 the most easy, convenient and safe in its application. It looks, in most instances, to the worth of the property itself that is the subject of the advancement, at the time of the estimate, and not to the value of a mere partial or uncertain interest therein at a former period. How can we estimate with certainty and accuracy what was the value, at the date of the gift, of a future interest, dependent upon a term for years or for life, in houses, or slaves, or public stocks, or bank shares; and especially if such future estate be merely contingent, as upon the donee’s attaining full age or marriage, or other uncertain event ? In such an estimate we would have to consider not what has actually occurred since the gift, but the then existing probabilities and chances, and to conjecture what a speculator might then have been willing to give as purchaser. Take the case of a settlement of a stock of slaves upon the expiration of a life estate; how is the value of the expectancy at the date of the gift to be estimated: by what arithmetic are the chances of deaths or propagations, of infirmity or vigour of constitutions to be calculated ?
Considerable light is thrown upon this subject by the case of Edwards v. Freeman, 2 P. Wms. 435, which was decided by Lord Chancellor King, with the aid of Sir Joseph Jekyll, Master of the Rolls, Ld. Ch. J. Raymond, and Mr. Justice Price. It had been often argued, and was much considered by the Judges. The material facts of the case were these:
Richard Freeman, on his marriage with his first wife Elizabeth, one of the daughters of Sir Anthony Kirk, by articles dated the 19th of February 1693, in consideration of the marriage and of £ 4000 portion, covenanted for himself and his heirs, with Sir Anthony Kirk, that he the said Richard Freeman, or his heirs, would within six months after request by Sir Anthony, his heirs, executors or administrators, settle all his lands in Battsford and in Gloucestershire, to the use of himself for *385 life, sans waste, remainder to trustees to preserve contingent remainders, remainder to Elizabeth his intended wife, for her jointure and in bar of dower, remainder to the first, &c. sons of the marriage in tail male successively, remainder to trustees for 500 years to raise portions for daughters, if but one daughter, £ 5000, if more, £ 6000, payable at eighteen or marriage, which should first happen, and to raise certain maintenances for such daughters till their portions should become payable : and he gave a bond for the performance of the articles. The marriage took effect, of which there was issue only a daughter, the plaintiff Mary; and Elizabeth the wife died soon after the birth of the daughter, no settlement having been made pursuant to the articles. About three years afterwards, Mr. Freeman married the defendant Anne Marshall, and settled the same lands comprised in the articles, without giving any notice of the articles, and had issue the defendants Richard and Anne, and died on the 20th November 1710 intestate;. and his widow the defendant Anne Freeman, took out administration to him, the plaintiff Mary being then eleven years old ; who having since intermarried with the plaintiff Walter Richards, they brought their bill for their distributory part of the intestate, Mr. Freeman’s personal estate, but did not pray the £ 5000. The defendants, by their answer, set forth the articles and bond, and insisted that thereby the plaintiff Mary had a portion of £ 5000 secured to her, and ought not to have any part of the personal estate of the intestate, unless she would bring that into hotchpot, to the intent the estate of all the children might be made equal.
It will be seen that the portion of £ 5000 was no present advancement, but a future provision by the father for a child not in esse, stipulated by marriage articles, aud secured by bond, to take effect after the father’s death, and after the expiration of estates for life to him and his wife in the lands out of which it tvas to be *386 raised, and upon the contingency of the failure of issue male of the marriage, and the further contingency of a daughter of the marriage, who should attain the age of ... eighteen or marriage.
And the Judges held that this future contingent provision was an advancement, to be brought into hotchpot in the distribution of the intestate’s personal estate. It was treated as an advancement of £ 5000, and of course estimated at its full value when it became effectual, and there was no pretence that it ought to be estimated according to its conjectural value at the date of the settlement.
The only difficulty was whether the provision could be treated as an advancement at all; and it was objected, 1st. That it was not a voluntary, donation from the father, but founded upon the consideration of marriage and a portion paid him on the part of the wife. 2dly. That it was not advanced by the father in his lifetime, but to take effect after his death. 3dly. That it was upon a contingency, and therefore could not be collated. But all these objections were overruled by the Judges, who decided that the case came within the spirit and meaning of the act, which was to prevent inequality amongst an intestate’s children. As to the 2d objection, it was determined that the act did not require the provision to be advanced in the father’s lifetime; if secured to the child in the life of the father it was sufficient; and it was in no wise material in what manner it was secured. What v/as meant by being secured was, of course, that it was provided for by the settlement, though upon a future contingency. As to the 3d objection, it was answered that although it could have been no provision until the contingency happened, (in other words, until it was made effectual by the event,) yet that after the happening of the contingency it was a provision, meaning an advancement then, and of course at its then value.
*387 The question in that case, whether the portion was to be treated as an advancement, would have been somewhat difficult, if the distribution of the intestate’s estate had occurred before the contingency had fully happened, and still the other distributees had required it to be collated : as if the female plaintiff had come before her age of eighteen demanding her distribution. Lord Raymond, adverting to this supposition, and in answer to the objection that if the contingency is not to be brought into hotchpot until it happens, what must become of the distribution in the mean time, said he did not see but that the Court might make a distribution, and order that if the contingency should happen, then that the money should be so distributed as to make all the distributees equal. And Sir Joseph Jekyll suggested a like distribution of the portion itself, by analogy to debts to the intestate’s estate, payable at future days, or upon contingencies, which he said may be distributed and valued as they fall in.
It may be well to observe here, that Sir Joseph Jekyll in his opinion quotes Swinburne 165, where it is said that if a father by deed settle an annuity on his child, to commence after his death, this is an advancement pro tanto; and by the same reason a reversion settled on a child, as it may be valued, is an advancement also. The quotation, it will be seen, is in reference to a future provision or advancement, and the context of the opinion, as well as the opinions of the other Judges and the decision itself, shews that such valuation does not recur to the date of the settlement. A present annuity, it is true, is to be valued as of the date of the grant, for its enjoyment then commences, though it be, like a slave or other perishable property, of uncertain duration. But if such annuity be brought into hotchpot after it is terminated, the Court will, in its discretion, direct it to be estimated according to its value at the date of the grant, or the payments made while it lasted to be brought in. Kircudbright v. Kircudbright, 8 Ves. R. 51.
*388 It is impossible, it seems to me, to resist the authority of Edwards v. Freeman, upon the ground that the daughter’s portion was not vested, but contingent only. That distinction was not taken in reference to the period at which the value of the portion was to be estimated, a point which was not made but conceded ; but upon the question whether the portion was any advancement at all, as to which the objection of its being contingent was merely cumulative. The objection was, in the first place, that the future provision to take effect after the father’s death could be no advancement, and if it could, then that it was not, because contingent only ; and if the objection had been sustained in either aspect, the provision for the daughter, though it had become effectual, would not have been collated. But the objection was overruled in both aspects. The Court held, that the provision was an advancement, because made by the father’s settlement; and that it was not the less an advancement because contingent, the contingency having happened upon which it was to become effectual : - and it was collated at its value at the time of the distribution, not because it was contingent, but because, though contingent, it had then taken effect.
There is nothing in the passage from Swinburne to indicate that a reversion is to be collated according to its value at the date of the gift: a reversion is placed upon the.same footing as a future annuity to commence at the-donor’s death, which surely ought to be estimated according to its value then, instead of going back, it may be twenty years, to the date of the gift, to conjecture its value at that period, taking into view the uncertainty of the annuitant’s surviving the donor. The difficulty botji as to an annuity and a reversion occurs at the time of the distribution, when the annuity may not have terminated, and the reversion may not have accrued. The distribution is not to be postponed on that account; and therefore ex necessitate, if to be collated *389 at all, it must be according to its estimated value at the time of the distribution; unless, indeed, the judicious suggestion of Lord Raymond and Sir Joseph Jekyll be adopted, in reasoning the case before them, of going on with the distribution, and thereafter distributing the future provision itself when or as it shall accrue.
It will thus, I think, be seen, that the true and uniform principle of all provisions made by an intestate parent in his lifetime for a child, is to treat them as advancements when they accrue. The mere power to sell a future provision does not, I think, render it a present advancement: if it did, then it would be applicable as well to contingencies and possibilities, as to vested remainders. It cannot control the law of intestacy, which revokes the gift so far as the donee is concerned: a purchaser from him acquires his title, but the donee himself is debtor to the estate for the value of the subject, if he seeks to come into partition or distribution with the other children. If he does not sell, then he succeeds at the proper time to the whole property itself in its then condition ; and it is not equitable that he should be allowed, moreover, any, it may be the greater, part of the value of that property, the more especially as he has not had the trouble and expense of its care and management. On the other hand, if he sells, it is equally unjust that he should have such allowance in value, while, by his act, the purchaser acquires the whole property itself.
It may be thought inequitable that the donee who sells his future interest, should not account for the money he receives from the purchaser. But, in point of fact, he does account for it, by being debited with the full value of the property in the division of the estate. He gains nothing, unless in the case of perishable property that actually perishes before it accrues to the purchaser, and then his gain is not from the estate, but from the purchaser, who has to bear the loss; and the *390 result to the estate is precisely the same, whether the donee sells or retains his interest. Under what circumstances, if any, he ought notwithstanding to account for what he has received from the purchaser, does not, I conceive, affect the principle in question; for if required so to account, it is only because of the certain specific benefit he has obtained by the actual sale.
I will not say that there may not be circumstances under which a future interest would be treated as a present advancement: as if the owner of only a reversion or remainder conveys it to his son, for the purpose of being sold by him to raise money for some pursuit or enterprise, and it is actually sold, that would be in substance an advancement' in money, and the donee would be accountable in the division of the estate for the precise sum received. Such cases do not militate against the general rule, but conform to its principle.
There is no authority that I have seen for the proposition, that a future provision is to be regarded as a present advancement; and at one period of our jurisprudence, it was extremely doubtful whether even present advancements were to be estimated as of the date of the gift, or according to their value at the time of the partition or distribution of the estate.
The doctrine of hotchpot has its origin in the English Common Law, in which, however, it prevailed to a very limited extent, being applicable only to advancements in frankmarriage, and not to other gifts to one of several parceners. Estates in frankmarriage, (now grown out of use,) are defined to be, where tenements are given by one man to another and his wife, who is the daughter or cousin of the donor, to hold in frankmarriage. In such a case, if lands descend from the same ancestor to the wife, and her sisters in fee simple, she or her heirs shall have no share of them, unless they will agree to divide the lands so given in. frankmarriage in equal proportion with the other lands descending. 2 Bl. Com. 115, 190. *391 Lord Coke says: “ it is clear that the value of the lands (so given) shall be accounted as it was at the time of the partition: for if the donor purchase more land after the gift, or if the land given in frankmarriage be by the act of God decayed in value, or if the remnant of the lands in fee simple be improved after the gift, or e con-verso, the law shall adjudge of the value as it was at the time of the partition, unless it be by the proper act or default of the parties.” 1 Thos. Co. Litt. 725. The gift in frankmarriage was a present advancement, and yet we see it was not valued as of the date of the gift.
The distribution of personal estates was unknown to the common law, and was introduced into the temporal Courts by the statute of distributions, 22 and 23 Car. 2 c. 10, which requires lands, as well as portions of personal estate, settled or advanced by the intestate in his lifetime, (except as regards the former in the case of the heir at law,) to be collated in the distribution. See the language of the statute, quoted 2 Wms. Ex’ors 907. There are no reported decisions upon it indicating that the advancement, whether present or future, is to be valued as of the date of the gift.
Our act of descents of 1785, (12 Hen. Stat. 139,) by its 15th section, provided that “ where any of the children of the intestate, or their issue, shall have received from the intestate in his lifetime any real estate by way of advancement, and shall choose to come into partition with the other parceners, such advancement shall be brought into hotchpot with the estate descended:” thus borrowing significant terms peculiar to the English Common Law doctrine of hotchpot, but applying them to a purpose unknown to that law, to wit, the bringing in of advancements not made in frankmarriage.
Our act of distributions of 1705, (3 Hen. Stat. 371-2,) by its 2d section, adopted the precise language of the statute of Charles in relation to advancements. And *392 our act on the same subject of 1748, (5 Hen. Stat. 444, § 1,) followed it in an abridged form.
But our revised act of distributions of 1785, (12 Hen. Stat. 146,) by its 25th section, provided that “where any children of the intestate, or their issue, shall have received from the intestate in his lifetime any personal estate by way of advancement, and shall choose to come into the distribution with the other persons entitled, such advancement shall be brought into hotchpot with the distributable surplus: thus departing materially from the language of the statute of Charles, and our former acts of distribution, and adopting that of the revised act of descents of the same session, above quoted, without alteration, except to adapt it to personal, instead of real estate.
Thus the revised acts of 1785, both of descents and distributions, while they confined advancements of real estate to partitions, and of personal estate to distributions, employed in relation to both the common law phrase of hotchpot, which is not to be found in the statute of Charles, nor in our acts of 1705 and 1748.
Our subsequent legislation, by the revised acts of descents and distributions of 1819, (1 Rev. Code, p. 357, 382,) conforms to the language of the revised acts of 1785 above quoted, with no other change than to place advancements of realty and personalty upon the same footing in respect both to descents and distributions.
It will thus, I think, be seen that but for the decisions of this Court already cited, it would be a question of considerable difficulty whether even present advancements, especially of real estate, should be estimated as of their value at the date of the gift; and those decisions were in relation to present advancements of personal property. I think, however, that the principle of them is not only reasonable, but that it ought to be extended, as it has been in Pennsylvania, to present advancements of real estate. But the reasoning on which *393 the American decisions are founded, is so far from being applicable to future advancements, that it serves, to my apprehension, to shew that such provisions ought to be collated at their value when they take effect, and so conformed to the true principle of present advancements, which take effect at the date of the gift. The general principle, I have endeavoured to shew, prevails in cases where the donee of the future interest has not the present possession and enjoyment of the subject by force of the gift: and I have applied it to the case before us, not because the property was burthened with a charge or incumbrance, (such for example as a mortgage,) but because, under the circumstances, the donee had not the effectual possession and enjoyment until his father’s death. There is nothing in the record to indicate that the rent reserved was not equal to what a stranger would have given ; and if it had appeared that by the favour of the father it was much less, then the difference would be the true advancement while the tenancy continued.
As to the claim for supposed improvements, which one of the exceptions of Hugh Chinn’s representatives suggests may have been -made by him upon the land before his father’s death, undoubtedly if it appeared that he had made permanent improvements thereon with his own means, there ought to be an allowance for them, by way of reducing the estimated value of the advancement. But there is not a particle of evidence on the subject, and none could avail any thing unless it reduced the value of the advancement below that of an equal share in the other lands. And for tho like reasons the claim for 100 dollars, alleged to have been paid by Hugh, for the extinguishment of an outstanding lease, is without foundation.
If I am correct as to the principles which should govern the conveyance to Hugh Chinn from his father, the same are equally applicable to the conveyance from, *394 the latter, of the 3d of August 1802, to his son Robert for the tract of 200 acres. There is no essential difference between the two transactions. In the latter, as well as the former, there was a donation of the fee, with the like postponement of the effectual enjoyment, by the reservation of the rent to the grantor during his life, unless terminated sooner by the privilege reserved to him of exacting the payment of £ 500. The only difference worthy of remark between the two being that in the case of Robert a clause of re-entry, to avoid the estate, in the event of a demand of the £ 500 and failure of payment is embraced; which is not to be found in the deed to Hugh, probably because the subject of reclamation is not mentioned at all in that deed, but only in the memorandum endorsed thereon. That privilege was exercised, and the money paid by Robert, who about the same time sold the land for £ 900; the effect of which was to ascertain the then value of that advancement to be £ 400, at which I think it should be collated in the partition of the intestate’s estate.
From that sum of £ 400, there ought not, it seems to me, to be any deduction on account of the parcel of 25 acres, part of the 200 acres. That parcel is stated in the deed to have been previously conveyed by Thomas Chinn the elder to his son Richard, and by him devised to Robert: but the consideration and the condition of paying the annual rent, and the condition of paying the £ 500 if required, extended to the whole grant; and it appears from the evidence, and the answer of Robert, that a consideration for the conveyance to Richard enured to Robert, to wit: the release of a debt due from him to Richard, the amount of which has not been proved, but is stated in Robert's answer at £ 50; and the evidence serves to indicate that there was probably a reservation of rent from Richard, like that from the other sons. It would seem, therefore, that under the circumstances, the whole tract of 200 acres was treated by the parties as an *395 advancement to Robert, though the previous conveyance, which was never recorded, and if still in existence has not been produced, was noticed in the deed to Robert, probably to prevent future misapprehension and controversy.
The sum of £ 80 has been properly debited by the commissioners to the intestate’s son-in-law John Upp, as the value of an advancement made to him of part of a lot in the town of Middleburg, to which the intestate had an equitable title, and on which the donee was residing and had made improvements, before the conveyance of the legal title to him, by the donor’s direction, from the proprietor of the town, of whom the latter had bought it at the price of £ 80. The reason assigned by the donor in his release to the donee accompanying the deed for relinquishing the title in his favour, to wit: the belief that the donee had expended in making improvements upon the property as much as it would bring if sold, did not render it the less a donation. A release from a father in his lifetime of money due him from a son, though prompted by strong considerations of moral propriety, arising out of the father’s own conduct in relation to the subject, has been held by the very destruction of the debt, to create an advancement. Gilbert v. Wetherell, 2 Sim. & Stu. R. 254; 1 Cond. Eng. Ch. R. 444.
Any suggestions or evidence in.relation to the respective advances in question, of an intention on the part of the donor that they should not be treated as such upon the partition of his estate, in the event of his dying intestate, I regard as quite immaterial. The matter is one depending not upon the intent of the donor, but the intent of the law applicable to cases of intestacy. Such an intent of the donor if not carried out is merely nugatory. Whether it could be carried out by any solemnity of contract between the donor and donee, with or without the concurrence, as parties thereto, of the other *396 heirs apparent, I deem it unnecessary in this case to express an opinion.
The views above presented relieve me from the necessity of considering, what might have been the effect upon the rights of the defendants of their supposed laches and acquiescence in the report of the commissioners.
I think there is no error in the interlocutory decree of Chancellor Carr, nor in the final decree of Chancellor Douglass.
Allen, J. I agree with Judge Baldwin and the Court below in opinion that Hugh Chinn is not to be treated as a purchaser for value of the land in the proceedings mentioned. Coming in with the other heirs for a portion of the lands descended from their father Thomas Chinn, the property conveyed, subject to the rent reserved or incumbrance charged, is to be treated as a •provision by the father for the son by way of advancement.
The father having died intestate prior to the act of 1819, the case is governed by the act of 1785, 12 Hen. Stat. at Large 139, which provides “that where any of the children of the intestate, or their issue, shall have received from the intestate in his lifetime any real estate by way of advancement, and shall choose to come into •partition with the other parceners, such advancement shall be brought into hotchpot with the estate descended.” In the construction of this statute, as well as of the provision in respect to the distribution of the personal estate of the intestate, it has been held that the advancement is to be valued at what it was worth at the time it was made. The rule as respects personal estate, (and there is no difference in principle between real and personal estate as to this point,) with the reason on which it is founded, is laid down in Beckwith v. Butler, 1 Wash. 224. Where a child is advanced in money or negroes, he need not bring into hotchpot the interest or *397 increase. For as he must sustain the loss by accounting for the value of the property when given, and by supporting and raising the negroes, so he is entitled to the increase of them. The justice and propriety of this rule have been commented on in the case of Knight v. Yarbrough, 4 Rand. 566; and by the Supreme Court of Pennsylvania in Oyster, &c. v. Oyster, &c., 1 Serg. & Rawle 422. And though it is conceded that under any rule which may be established, particular cases of hardship may arise, yet upon the whole, in the vast majority of cases the rule as settled, is best calculated in practice to bring about that equality which the statute was designed to effect. That it conforms more closely to the terms of the statute than any other seems to be conceded. The true notion of an advancement is a giving by anticipation the whole or a part of what it is supposed a child will be entitled to on the death of a parent. Osgood v. Breed’s heirs, 17 Mass. R. 356. Hence the statute refers to any real estate received in the lifetime of the intestate. The question, therefore, to my mind is narrowed down to the enquiry, did the child receive any present interest or estate ? If he did, if an absolute title to an estate by the gift of the father vested in him, to be held at his risk if destroyed or depreciated in value, capable of being aliened and having a present value, that value as at the time of the gift should be the subject brought into hotchpot. Otherwise the grossest inequality may be brought about. The father is entitled to a reversion expectant on a life estate in houses and mills, and conveys this to the son, who sells the reversion for a large sum, and before the death of the father the houses are destroyed : Is the son to bring in the value of the reversion when given, and which he has received, or the depreciated value at the time of the father’s death ? Certainly that which he received is the proper measure. So, a father gives slaves, retaining a hire for life or years, or he gives the remainder after his death. *398 The son sells this remainder, and the slaves die before the time runs out: Is he to enjoy what he has thus received, and come in for a full distribution besides? It may be said that if the subject perished in this way, the soa never having sold, it would be hard to hold him liable to account; but this argument applies as well to the case of an absolute gift of the whole estate as to a limited interest. By consenting to receive he takes the hazard of loss, and has the benefit of increase or appreciation in value.
The case of Edwards v. Freeman, 2 P. Wms. 435, which seems to be the only authority relied on in the Court below and here, for fixing the value as at the death of the father, instead of the date of the conveyance, seems to me to have no bearing on this question. On the question whether the son here, should be charged with it as an advancement, or take as purchaser, the authority was pertinent, and I think decisive. In that case, which is fully stated by Judge Baldwin, there was a provision for the daughter in the marriage settlement, to take effect upon her attaining the age of eighteen or her marriage. There could be no present advancement. The person was not in existence at the date of the settlement. No estate or interest then passed from the father. Two contingencies must happen before a scintilla of interest in his estate could vest in the donee, first, the birth of a daughter, second, that she should attain the age of eighteen or marry.
Both contingencies had happened; and upon the question whether this was to be treated as an advancement, Sir Joseph Jekyll remarked, “that the provision within the statute need not take place in the father’s lifetime; a future provision is a barjpro tanto, a portion assured or secured to a child, though in futuro, is a provision according to its value.” And to sustain this conclusion, he cites Swinburne 165, where it is said, ■ that if a father settles an annuity on his child to com *399 menee after his death, this is an advancement pro tanto; and by the same reason, a reversion settled on a child, as it may be valued, is an advancement also. But he does not say or intimate that advancements of this kind are to be valued as at the period when the property comes fully into the possession of the child. On the contrary, the fair inference from what he does say is, that it is to be valued as at the time when the provision takes effect. It does take effect when assured or secured to the child, beyond the reach of any contingency, for then an estate or interest vested in the child, which he says is a provision according to its value. According to its value when ? Certainly when it absolutely vested. Otherwise it would have been idle to say it was a provision as it may be valued. And the case of the annuity and the reversion, are referred to as constituting advancements for the same reason; although there was no present enjoyment of the property, an interest or estate passed as they may be valued.
This view of the real question intended to be decided in the case, is rendered more clear, if possible, by the remarks of Lord Ch. Jus. Raymond. After shewing that, to make it an advancement, it was sufficient if it be secured to the child in the lifetime of the father, he adverts to the objection growing out of the contingency, and says, “ I grant it could have been no provision until the contingency happened ; but it cannot be denied that when the contingency has happened, it is a provision.” Thus shewing the question turns upon the fact when is the provision assured; when does an absolute interest part from the father and vest in the child ? In that case, not until the contingency happened, which was after the death of the father. And therefore no question could arise about the time it was to be charged. But where, as in this case, the provision is made by the deed, the reversion in fee vesting instantly, and actual possession passing, too, subject to a rent or incumbrance, *400 the value of the estate subject to such incumbrance was the advancement. With this he was properly chargeable. Any depreciation was at his risk; any increase in value, whether brought about by his own skill and labour or the gradual appreciation of property, belonged to him. The increased value constituted no part of the gift when made by the father, and therefore no part of his estate to be brought in for distribution and partition.
When it is said a provision to take effect in futuro, is no present advancement, a proper discrimination is not drawn between a provision depending on a contingency which may or may not happen, and an advancement of a certain interest which vests absolutely at the time. In the first case the father has parted with no portion of his estate. Unless (and until) the contingency happens, he gives nothing, the son receives nothing. But giving land subject to a rent reserved for life or years, or encumbered with a charge of a certain sum in lieu of rent; or slaves, reserving hires for life or years, or retaining their services for the same period, is not a provision depending on a contingency, but a certain fixed and irrevocable interest vested in the donee, and an immediate diminution of the father’s estate pro tanto. If the advancement is not to be accounted for according to the value when made, besides the gross injustice to the other heirs and distributees which might occur iu the instances already put, the rule at last could be but partially executed in some cases, and would be attended with insuperable difficulties in others. A father advances his eldest son by giving him the reversion to a tract of land in which another (say his mother, a case not unlikely to occur,) has a dower estate, and dies, the doweress surviving: must not the reversion be valued in this instance? Yet the life estate may endure for a long time. This, then, must constitute an exception, and the same thing might occur wherever property was given with a charge or incumbrance continuing for years. The father may die in the *401 interval. The inconvenience attending the practical working of the rule would be made manifest frequently in respect to slaves, a species of property oftener advanc.ed to children than any other. A father gives his son a family of slaves, subject to the payment of an annual sum to himself or another for life or years. The son sells them, and they are carried to a distant state. How is he to bring them or their increase into hotchpot after the lapse of several years ? Whereas the value of the advancement when made, could be readily ascertained.
If it be argued that the memorandum touching the payment of the £ 500 if called for, made this a contingent provision, it may be replied that this contingency did not affect the reversion in fee conveyed, but related entirely to the incumbrance charged; and' would merely affect the amount which the party coming in for partition would be bound to bring into hotchpot. The contingency never happened, as no effectual demand followed up, was made. The case in the actual state of facts, is to be decided as though the only reservation had been the rent. The question could never arise until the death of the father intestate, and the claim of the son to come in for participation with the other coparceners in the estate descended. If prior to the intestate’s death the £ 500 had been demanded and paid, the value of the land at the date of the advancement, reduced by the sum so paid, and the charge for rent up to that period, would have been the sum to bring into hotchpot. I think that the rule adopted in the interlocutory decree of 181.9, settling the principles on which the advancement to Hugh Chinn was to be accounted for by treating it as an advancement, taking effect at the death of the father, instead of the date of the conveyance, was erroneous, and if there were nothing else in the record, I should be of opinion to reverse the decree..
*402 But\it seems to me there has been such an acquiescence in the decree of 1819 by the parties interested in this estate, as to render it an unjust and improper exercise of the discretion of the Court to rehear and reverse it at this late day. A final decree can only be reviewed and reversed upon a bill of review, or by appeal within five years after it is pronounced. But this is an attempt to rehear and set aside an interlocutory decree as it is alleged, nearly seventeen years after it was pronounced ; during all which period the parties seem to have remained quiet j have held their respective portions of their father’s estate according to a division made upon the principles settled by the decree of 1819 ; and according to the answers filed to the bill of injunction and petition for a rehearing, after the various parties have treated the land as their own, and in several instances have transferred, conveyed and encumbered their portions with the knowledge of the parties now excepting to the report. The truth of these statements in the answers is confirmed by what appears to have occurred with reference to the appellants during the long interval which elapsed whilst this cause was sleeping on the docket. Several changes in the condition of the parties occurred by deaths and marriages, and all the heirs of Hugh Chinn except one had, according to the allegations of their petition, disposed of their portions of the land derived from their father.
The ancestor Thomas Chinn died in 1816. The bill is filed for a partition as early as 1817. All the heirs were adults but one, a granddaughter. Before the interlocutory decree Hugh Chinn, one of the heirs, died leaving some infant children. The suit was revived against them, and they answered by their guardian ad litem. Elizabeth Brent a daughter of said Hugh, and apparently entitled to one eighth of his estate, for Hugh seems to have left eight children, died before the decree of 1819, leaving several infant children. But their fa *403 ther who would also have been tenant by the curtesy, was a defendant. On the death of Hugh Chinn the suit was revived by consent against Brent and wife and the other children and heirs of Hugh. And on the death of Mrs. Brent, her husband as guardian ad litem, answered for his infant children and the other infant heirs; and subsequently in his own right and as guardian and next friend of his infant children united in the cross-bill which had the same object in view with the original bill; a full and fair division of the estate of Thomas Chinn deceased.
Both causes were heard together, and the decree settling the principles of the case was pronounced in November 1819. The commissioners reported to the April term 1820. Exceptions appear to have been filed to the report in September 1820; and from that time until 1836 nothing appears to have been done, except to suggest the death of a defendant in 1827, a motion to revive against his heirs in 1828, and a second answer to the cross-bill by Murray and wife is found amongst the papers endorsed as filed April 1828. During all this period, though the heirs of Hugh Chinn as they arrived at age seem to have disposed of their interests in his estate : though the other heirs of Thomas Chinn the elder were according to the answers to the petition for a rehearing, treating their portions as their own, selling, encumbering and conveying the land with the knowledge of the appellants, no attempt was made to disturb the partition or procure any action on the exceptions to the commissioners’ report. If the question is now to be opened, great injustice in all probability may be done to the parties and to innocent purchasers. It seems to me that the doctrines so repeatedly announced by this Court in reference to laches, apply with greater force to a case like this in suit than to a claim which has not been the subject of litigation. Suits for partition are of every day’s occurrence in the County Courts. In the com *404 mencement they are usually what are termed friendly ... suits, but controversies arise during their progress, the principles are settled by the Court and a partition is made, and exceptions filed; but nothing more is done. The conduct of all concerned shews an acquiescence in j-esoltj and that the exceptions are abandoned ; and after the lapse of years a total change in the condition of the parties and the subject, some party “picks from the worm holes of long hidden years this forgotten record, and renews the controversy.” The exceptions here are not to the details of the report, but to the principles of the decree in conformity with which the report was made. I think the objection comes too late after what has occurred in .this case. And that in suits of this kind, especially for the partition of estates, the repose of titles should prevent us from giving countenanceto the attempt to disturb that which was so long at rest.
I am, therefore, for affirming the decree.
•Cabell, P. and Brooke, J. concurred with Daniel, J.
The decree was as follows:
This Court is of opinion, that in the decree of the 27th November 1819, directing a partition of the real estate of Thomas Chinn senV deceased, there is no error, in so far as it treats the house and lot in Middleburg, in said decree mentioned, as an advancement of real estate to Upp and his wife by the said Thomas Chinn sen’r, in his lifetime, and directs the same to be brought into hotchpot for general distribution at the price of eighty pounds. Nor does it seem to the Court that there is any error in said decree in directing that Robert Chinn should, as the condition of his being permitted to share in the division of the estate, first bring into hotchpot the tract of land of 199£ acres, alleged to have been conveyed to him by the said Thomas in his lifetime, a short time before the death of the latter. The Court is further of *405 opinion, that the commissioners appointed by the said decree, to make the partition and allotment therein directed, acted properly in allotting to the said Robert as a portion of his share the said tract of land as of the value of 3620 dollars, and in charging Upp and wife in said division with the sum of eighty pounds as the value of the advancement received by them in the said house and lot in Middleburg; and, therefore, that there is no error in the decree of 1836 in overruling the first and third exceptions filed by Robert, and the fourth exception filed by the heirs of Hugh Chinn to the report of said commissioners, so far as objection is made in said exceptions to the action of the commissioners in the foregoing particulars. The Court is, however, of opinion, that there is error in said decree of 1819, in treating the tract of land conveyed by the said Thomas Chinn sen’r, to the said Robert by the deed of the 3d day of August 1802, and the tract of land conveyed by the said Thomas to his son Hugh by the deed of the 27th day of November 1800, as advancements ; and in directing that Robert should, in the division of the estate, be charged with the four hundred pounds, the difference between the price paid by him to his father for his said tract and the price at which the said Robert sold it; and in directing that the heirs of Hugh Chinn should first bring into hotchpot the tract conveyed by the deed of the 27th day of November 1800, as the condition of their being permitted to participate in the division. The Court is further of opinion, that the balance of the five hundred pounds covenanted by Hugh Chinn to be paid to his father, was, under the circumstances of the case, upon the death of the latter, a debt due to his representatives, and constituted a charge upon the tract of land aforesaid, conveyed to the said Hugh by the deed of the 27th day of November 1800, but that the Court below erred in assuming 1399 dollars as such balance, and rendering a decree therefor, with *406 out having first had an account to ascertain the true balance due upon said covenant, and without having before it the administrator of Thomas Chinn sen’r, in his character of representative. This opinion renders it necessary that the decree of 1819, and the decree of 1836, confirming the commissioners’ report made in pursuance thereof, and rendering a decree for the said 1399 dollars, as also the decree rendered at the May term 1840, should all be reversed, and a redivision of the said estate ordered'. In such redivision it is the opinion of the Court that the heirs of Robert Chinn should not be- compelled to account for the four hundred pounds before mentioned, nor the heirs of Hugh Chinn to bring into hotchpot the tract of land conveyed to the said Hugh by the deed of the 27th day of November 1800. The Court is further of opinion, that justice to the parties, under the circumstances of the case, requires that in such re-division, allowance should be made for any permanent improvements made upon the lands by the parties in possession, under the former partition and allotment, so far as said improvements constitute any addition to the present value of the estate to be divided. The Court is further of opinion, that the appellants are entitled to their respective shares of the rents and profits accruing since the date of the first division, and that an account of the same ought to be ordered. In said account, it is the opinion of the Court that the estimate of said rents and profits ought not to be based on the permanent improvements, if any, made by the parties in possession since the date of the former division. The said decrees of 27th November 1819, of 24th October 1836, and of 18th May 1840, are therefore all reversed and annulled, with costs, and the cause is remanded for the proper accounts to be taken, and such proceedings to be had and decrees to be made as will do justice among the parties in accordance with the principles of this opinion and decree.